54 CCPA

**Martin J. BLICKSTEIN and Martin A. Mittler, Appellants,**

v.

**Hugo SEIDEN, Appellee.**

**Patent Appeal No. 7773.**

United States Court of Customs and Patent Appeals.
June 22, 1967.

Burgess, Dinklage & Sprung, Arnold Sprung, New York City, for appellants.

Ostrolenk, Faber, Gerg & Soffen, Samuel H. Weiner, New York City, for appellant.

Before WORLEY, Chief Judge, and RICH, SMITH, and ALMOND, Judges.

WORLEY, Chief Judge.

The controlling issue in this appeal from the Board of Patent Interferences is whether Seiden, senior party by virtue of his March 29, 1962, filing date, has satisfactorily proved an actual reduction to practice of the instant invention prior to December 20, 1961. That is the earliest date asserted in the preliminary statement of Blickstein and Mittler (Blickstein), the junior party by virtue of their May 31, 1962, filing date. From our review of the record we agree with the board that Seiden has discharged his burden of proof.[1]

The invention relates to an adjustable structure which Seiden states can be used in both tuning and trimmer capacitors [2] and which is described in connection with a trimmer capacitor. The brief for appellants explains the structure as follows:

> The subject matter of the interference involves a non-rotating piston trimmer capacitor. A capacitor is a device having two electrodes separated by a non-conductive material (dielectric). A charge may be held on the electrodes due to the natural electrostatic attraction across the dielectric. In a piston trimmer capacitor the dielectric is generally in the form of a glass tube. One electrode is in the form of a piston which may be axially moved within the tube, and the other electrode is in the form of a conductive layer, such as metallizing, or a foil on the outside of the tube. The capacitance may be varied by adjusting the axial position of the piston within the tube. The piston trimmer capacitor is generally used for making precise capacitance adjustments in electrical equipment. Piston trimmer capacitors may be classified as two general types, i. e., rotating and non-rotating. In the rotating type the piston is simply secured to the end of an adjustment or lead screw and rotates with the screw as its axial position for adjustment of the capacitor is varied by turning the screw. In a non-rotating piston trimmer capacitor rotation of the lead or adjustment screw moves the piston axially without the piston being rotated. The invention as covered by the count of the interference is directed to a non-rotating type piston trimmer capacitor having a very specific structure which allows the piston to be axially moved in the dielectric tube without rotation. * * *

The single count in issue reads:

> 1. An adjustable reactance device comprising the combination of a hollow dielectric form having an electrode secured thereto, a conductive piston contained coaxially within said dielectric form and being movable along the axis of said hollow dielectric form, a support bushing, and an operating mechanism for moving said piston with respect to said dielectric form; said bushing having an enlarged diameter portion receiving and supporting one end of said dielectric form, and an axially extending portion positioned within and concentric with said dielectric form; said axially extending portion of said bushing having an axially directed slot therein extending to a free end thereof; said piston being contained between the outer diameter of said extending portion of said bushing and the inner diameter of said dielectric form; said operating mechanism including an elongated operating

---

1. The board did not find it necessary to consider testimony submitted by Blickstein, nor do we.

2. According to Seiden's testimony, tuning capacitors are constructed to be suitable for being adjusted or varied repeatedly. A trimmer capacitor is used to provide a fixed capacitance in an electronic circuit and is left set in the position to which it is initially adjusted.

screw and a screw receiving member; said bushing having an interior bushing portion; said elongated screw having an extending section; said extending section of said screw being captured in said interior portion of said bushing whereby said elongated screw has a position which is axially fixed with respect to said bushing and said elongated screw is rotatable with respect to said bushing; said screw receiving member being integrally connected to said piston and threadably receiving one end of said screw member; said screw receiving member having an extending portion; said extending portion of said screw receiving member being slidably received by said slot in said bushing.

The evidence on behalf of Seiden includes testimony by Seiden himself, Hirschberg, Goodman, Gershkowitz, Schultz and Hope, all employees of Seiden's assignee, J. F. D. Electronics Corporation, during the period in question. Also submitted were exhibits A through K. A, B and C are sketches dated in August 1961, D, E, F and G are mechanical parts for capacitors, and H–1 and H–2 are a data sheet of test results and a corresponding graph, respectively. Exhibit K is a sketch dated January 1962.

The record establishes that Seiden was hired by J. F. D. August 1, 1961, as an engineer to develop tuning capacitors. Prior to that he had conversations with Hirschberg concerning some of the problems encountered in piston trimmer capacitors in which the piston constituting one electrode rotated with its adjusting screw while being adjusted in axial position. Seiden testified that he conceived the present invention at the time he made the sketches constituting Exhibits A, B and C in August 1961; that he had the company's model maker, Hope, prepare parts D, E and F as shown in the sketches; and that a working model of a capacitor was then made and subjected to a capacitance test reported in Exhibits H–1 and H–2, the former dated September 28, 1961.

Hirschberg, chief mechanical engineer of J. F. D., testified that he discussed the problems relative to trimmer capacitors with Seiden prior to the latter's employment by J. F. D. He also stated that Seiden, whose desk was just in front of his own, showed him the sketches of Exhibits A, B and C in August 1961, explaining the idea of putting the piston in a slotted bushing to prevent its rotating during axial movement. Hirschberg further testified that he gave Seiden permission to use the model shop and test facilities, which were under his authority, and that he saw an assembled device within two or three weeks of the August sketches and saw the test results, placing the time of seeing the graph of Exhibit H–2 in August or September, 1961.

The witness Goodman, vice president and general manager of J. F. D., stated that he had seen the sketches of Exhibits A, B and C and had also discussed the structures shown therein with Seiden. He testified to seeing parts like those of Exhibit F assembled into a complete device in September or October of 1961 and seeing the test results of Exhibits H–1 and H–2 around the same time.

Gershkowitz was in charge of the test laboratory at J. F. D. He testified that he became aware of Seiden's work around August 1961 when tests were to be run. He recognized the exhibits concerning the test results and stated that he observed part of the tests and saw the model that was tested. Gershkowitz testified that the model tested included the elements set forth in the count although he conceded he did not disassemble it and did not recall seeing certain portions of it.

Schultz, who was a technician involved in testing components under Gershkowitz, testified that Seiden brought him a model of a piston trimmer capacitor with a rotating screw and a non-rotating piston. He identified the data and graph sheets of the test, stating that he ran the test reported thereon and describing the equipment used. Schultz testified as to the structure of the model tested, which testimony indicated the model supported the count although he also conceded that

he could not see the end of the slot or the specific structure of the piston and nut.

Hope, employed as a model maker by J. F. D., testified to making the parts of Exhibits D, E, F and G in accordance with drawings and instructions from Seiden. His testimony places that activity around August or September of 1961.

The board discussed the evidence in detail, and held it to show Seiden was the originator of the invention at J. F. D., and entitled to the benefit inuring from the activities of the employees directed toward reduction to practice. Upon analysis of the objects of the invention stated in Seiden's application, the board held that the test sufficiently simulated the practical application of the invention as a capacitor generally to constitute an actual test of the features upon which the invention depends.

The board concluded:

Considering all of the evidence and giving all competent testimony making up the continuous story its proper place and weight, Patterson et al. v. Hauck, * * * [52 CCPA 987, 341 F.2d 131, 144 USPQ 481], and cases cited therein, we hold that Seiden has established by a preponderance of sufficiently corroborated evidence the actual reduction to practice of the invention in issue long prior to December 20, 1961, the earliest date alleged for any activity by Blickstein et al.

Blickstein urges that the record "leaves completely vague and unanswered" the exact origin of the device tested in accordance with Exhibits H–1 and H–2, and questions the proof as to the structure of that device. It is also contended that the test reported in those exhibits is not adequate to prove reduction to practice of the capacitor.

The testimony of Seiden reflects a continuous account of the history of the invention describing not only the conception but also construction of a model embodying the count structure and the successful testing of the model. As to the making of the model, Seiden stated "surely I built a complete unit [capacitor] with all parts," setting the time thereof as August or September of 1961.

As to testing, Seiden referred to life or durability tests on an apparently incomplete unit and to subjecting the model capacitor to electrical tests. Concerning the latter, he testified:

Q237. Will you describe the nature of the test that was performed? A. The test was performed in such a way that the capacitor was measured after each adjustment of the screw.

Now, the screw was adjusted in equal steps; that means half turn, quarter turn or one turn but always the same.

Q238. What type of electrical testing equipment was used? A. Capacitance bridge.

Q239. Was this a standard test? A. Yes.

Q240. Did you see the testing being made on any of your models? A. Yes.

Q241. Who else was present at the test? A. Jerry Gershkowitz.

Q242. Do you remember when these tests were performed? A. It must have been somewhere in September or October, 1961, somewhere in this area.

 Coming now to the matter of whether Seiden's testimony is adequately corroborated, the law on that point is considered in the following passage from Hasselstrom v. McKusick, 324 F.2d 1013, 51 CCPA 1008, quoted with approval in Patterson v. Hauck:

* * * we are in complete agreement with the necessity for corroboration of an inventor's testimony. However, the purpose of corroborative evidence is to confirm and to strengthen the testimony of the inventor. [Quoting in a footnote Rivise and Caesar, Interference Law and Practice, Vol. 3, p. 2127.] Obviously the amount and quality of corroborative evidence that is necessary in any given case will vary with the facts of that case. As

we observed in Phillips and Paul S. Starcher v. Carlson, 278 F.2d 732, 47 CCPA 1007, there can be no fixed single formula in determining the sufficiency of corroborative evidence.

To the same effect is Guinot v. Hull, 204 F.2d 281, 40 CCPA 982:

> A study of the cases issuing from this court reflect[s] the consistent application of the doctrine of independent corroboration of the inventor; that each case is decided upon the basis of the facts therein; and that the entire record is examined to determine whether the necessary proof is present in a given case.

■ Here, we think that Seiden's testimony finds adequate corroboration in the testimony of the other witnesses and in the exhibits. Hope stated he made components for a capacitor of the type in question; Schultz testified to making an electrical test on a model brought to him by Seiden; Gershkowitz stated that he observed the tests and saw the model which was being tested; and Hirschberg and Goodman testified to seeing a model capacitor and the test results thereon. Hirschberg answered affirmatively questions whether the test model had the various elements required by the count, as did Gershkowitz and Schultz. It is true that those witnesses admitted they were unable to see everything within the model because they did not disassemble it, and the outer conductive electrode extending over a portion of the dielectric tube somewhat obstructed the view of the interior. However, they testified that no other similar capacitor made by J.F.D. exhibited a linear response as shown by the test results of Exhibits H–1 and H–2 and had the particular range of capacitance values covered by those test results.

The test involved connecting the capacitor in a bridge circuit and measuring the capacitance after every half turn of the adjustment screw in a single direction. The results showed the capacitance to vary continuously in the same direction as the adjustments were made, there being no reversals in the direction of capacitance change. According to the evidence, that was a standard test except for its being made more severe by measuring after each half turn of the screw instead of after every two turns as was the usual practice.

■ The count does not specify any particular use. In such case, evidence proving substanital utility for any purpose is sufficient to establish reduction to practice. Gordon v. Hubbard, 347 F.2d 1001, 52 CCPA 1598. Moreover, the record demonstrates that the purpose of the invention was to provide a direct travel mechanism whereby the piston could be adjusted without producing any reversal in the capacitance change.[3] It does not show that any change in the use of the capacitor under normal electrical conditions was contemplated and there appears to be no indication that the new construction would be expected to change the other basic properties of the capacitor from those of capacitors for corresponding purposes in the prior art. We think the test showing the present structure to be free of the capacitance reversals sought to be avoided was sufficient to demonstrate that the structure was capable of successfully achieving the use contemplated for it.

■ We have reviewed the record in light of appellants' arguments and the decisions relied on, but are not convinced that the board erred in holding that Seiden has established by a preponderance of properly corroborated evidence the construction of a complete and operative device in accordance with the count and the adequate testing of such device.

The decision is affirmed.

Affirmed.

---

3. Seiden stated in his testimony:
> The main problem was linearity of the capacitor. Therefore, we did run linearity tests.

Commenting on the results plotted on Exhibit H–2, Schultz testified:

> The results were very satisfactory for me at that time because it didn't show any reversals. The basic object of this particular design was to eliminate reversals in the capacitor.