59 CCPA

**Donald D. WILLIAMS and Hughes Aircraft Company, Appellants,**

**v.**

**The ADMINISTRATOR OF the NATIONAL AERONAUTICS AND SPACE ADMINISTRATION, Appellee.**

**Patent Appeal No. 8712.**

United States Court of Customs and Patent Appeals.

Aug. 10, 1972.

Petition for Reconsideration Denied Nov. 30, 1972.

W. H. MacAllister, Jr., Los Angeles, Cal., Richard R. Trexler, Chicago, Ill. (Olson, Trexler, Wolters & Bushnell), Chicago, ill., John M. Lee, Los Angeles, Cal. (Fulwider, Patton, Rieber, Lee & Utecht), Los Angeles, Cal., Richard P. Schulze, Washington, D. C., attys. of record, for appellants.

Robert F. Kempf, Silver Spring, Md., Neil B. Siegel, John B. Farmakides, Washington, D. C., attys. of record, for appellee. Leonard Rawicz, Potomac, Md., of counsel.

Before RICH, Acting Chief Judge, ALMOND, BALDWIN and LANE, Associate Judges, and MALETZ, Judge, United States Customs Court, sitting by designation.

BALDWIN, Judge.

This appeal is from the decision of the Patent Office Board of Patent Interferences, adhered to on reconsideration, in a proceeding under Section 305 of the National Aeronautics and Space Act of 1958 (42 U.S.C. § 2457). The board held that the Administrator of the National Aeronautics and Space Administration (hereinafter NASA), on behalf of the United States, is entitled to receive the patent to issue on Williams patent application serial No. 391,187, filed August 21, 1964.[1] Section 305 reads in pertinent part:

> 42 U.S.C. 2457. Property rights in inventions.—*Exclusive property of United States; issuance of patent.* (a) Whenever any invention is made in the performance of any work under any contract of the Administration, and the Administrator determines that—
>
> (1) the person who made the invention was employed or assigned to perform research, development, or exploration work and the invention is related to the work he was employed or assigned to perform, or that it was within the scope of his employment duties, whether or not it was made during working hours, or with a contribution by the Government of the use of Government facilities, equipment, materials, allocated funds, information proprietary to the Government, or services of Government employees during working hours; or
>
> (2) the person who made the invention was not employed or assigned to perform research, development, or exploration work, but the invention is nevertheless related to the contract, or to the work or duties he was employed or assigned to perform, and was made during working hours, or with a contribution from

---

1. The application, which is assigned to co-appellant Hughes Aircraft Company (hereinafter Hughes), is designated a continuation-in-part of serial No. 22,733, filed April 18, 1960, for "Velocity Control and Orientation of a Spin-stabilized Body."

the Government of the sort referred to in clause (1),

such invention shall be the exclusive property of the United States, and if such invention is patentable a patent therefor shall be issued to the United States upon application made by the Administrator, unless the Administrator waives all or any part of the rights of the United States to such invention in conformity with the provisions of subsection (f) of this section.

\*　\*　\*　\*　\*　\*

*Patent application.* (c) No patent may be issued to any applicant other than the Administrator for any invention which appears to the Commissioner of Patents to have significant utility in the conduct of aeronautical and space activities unless the applicant files with the Commissioner, with the application or within thirty days after request therefor by the Commissioner, a written statement executed under oath setting forth the full facts concerning the circumstances under which such invention was made and stating the relationship (if any) of such invention to the performance of any work under any contract of the Administration. Copies of each such statement and the application to which it relates shall be transmitted forthwith by the Commissioner to the Administrator.

*Issuance of patent to applicant; request by Administrator; notice; hearing; determination; review.* (d) Upon any application as to which any such statement has been transmitted to the Administrator, the Commissioner may, if the invention is patentable, issue a patent to the applicant unless the Administrator, within ninety days after receipt of such application and statement, requests that such patent be issued to him on behalf of the United States. If, within such time, the Administrator files such a request with the Commissioner, the Commissioner shall transmit notice thereof to the applicant, and shall issue such patent to the Administrator unless the applicant within thirty days after receipt of such notice requests a hearing before a Board of Patent Interferences on the question whether the Administrator is entitled under this section to receive such patent. The Board may hear and determine, in accordance with rules and procedures established for interference cases, the question so presented, and its determination shall be subject to appeal by the applicant or by the Administrator to the Court of Customs and Patent Appeals in accordance with procedures governing appeals from decisions of the Board of Patent Interferences in other proceedings.

\*　\*　\*　\*　\*　\*

*Definitions.* (j) As used in this section—

(3) the term "made", when used in relation to any invention, means the conception or first actual reduction to practice of such invention.

Upon receipt of a statement of the nature provided for under § 305(c), the Administrator filed a request pursuant to § 305(d) that the patent on the Williams application (with allowed claims 19–21) issue to him, based on work under contract NAS 5–1560 entered into between NASA and Hughes on August 21, 1961. Hughes thereupon requested a hearing before the board, as also provided for under § 305(d), to determine whether the Administrator was entitled to receive the patent. The board held that the Administrator was so entitled under the provisions of § 305(a) because the launching and manuevering of a communication satellite known as Syncom II in July and August of 1963 constituted the first actual reduction to practice of the invention and was accomplished in the performance of work under the contract. It reached that conclusion as a result of finding that appellants failed to prove that their activities before the contract was entered into amounted to an actual reduction to practice.

## The Invention

The invention in dispute is apparatus for controlling the attitude or orientation of the spin axis of a spinning body by applying a precessing torque to the body under control from a location external to the body, defined in representative claim 19 as follows:

19. Apparatus comprising:

(a) a body adapted to spin about an axis;

(b) fluid supply means associated with said body;

(c) a valve connected to said fluid supply means;

(d) fluid expulsion means disposed on said body and coupled with said valve and oriented to expel said fluid substantially along a line parallel to said axis and separated therefrom;

(e) means disposed on said body for providing an indication to a location external to said body of the instantaneous spin angle position of said body about said axis and the orientation of said axis with reference to a fixed external coordinate system;

(f) and means disposed on said body for receiving from said location control signals synchronized with said indication;

(g) said valve being coupled to said last-named means and responsive to said control signals for applying fluid to said fluid expulsion means in synchronism therewith for precessing said body to orient said axis into a predetermined desired relationship with said fixed external coordinate system.

A principal feature involves a jet, disposed on the body at a position spaced from the spin axis and directed to expel fluid in a direction parallel to that axis, which applies a turning force to the body about a preselected axis normal to the spin axis to precess the spin axis in a desired direction. The jet is supplied from a tank of pressurized gas on the body through a valve controlled from a location external to the body. Since the body is spinning about its axis, continuous operation of the jet throughout a spin cycle would result in a net zero precessing torque. Therefore precessing is accomplished by pulsing the jet during a portion only of each succeeding spin cycle. The particular portion of the spin cycle during which the jet is pulsed is determined by the direction in which precessing is desired and the pulsing is continued until the desired attitude is attained.

## General Background

There is no real dispute over the pertinent facts. Hughes, as part of a program it began in late 1959 to develop a spin-stabilized, synchronous communications satellite, built a "dynamic wheel" in a laboratory to test an arrangement for attitude control conceived by Williams (now deceased).[2] Hughes operated that wheel on April 2, 1960, a movie film of which operation is in evidence as Exhibit 4, and also operated it from time to time thereafter. The Williams invention was then adopted for the program, which was designated Comsat and had the objective of building a satellite that could be flown. In 1960 the parent application was filed and a prototype Comsat satellite was built, the prototype being subjected to various tests in that year and in the spring of 1961. Afore-

2. The satellite was disclosed in appellant's application as orbiting in a circular orbit in synchronism with the earth, *i. e.*, in a west-to-east equatorial orbit with a period of 24 hours, so as to hover over a single point on the earth. It had an antenna aligned with its spin axis and acting in association with relay equipment to receive communications signals from one point on earth, amplify them, and transmit the amplified signals to a remote receiving point. When launched as described in the application, the satellite attained the desired orbit with its spin axis perpendicular to the earth's axis. The attitude control system was used to precess the satellite to bring its spin axis parallel to the earth's axis because that position was necessary for most satisfactory performance of the antenna.

mentioned contract NAS 5–1560 of August 21, 1961, was entered into after Hughes proposed to NASA the building of communications satellites based on the Comsat program. Under that contract and superceding agreements, Hughes provided satellites along with ground equipment and participated in the successful launching and manuevering of NASA's Syncom II in July and August of 1963.

### The Dynamic Wheel

The laboratory layout for the dynamic wheel test is shown in a diagram in evidence as Exhibit 91, reproduced below:

[A6143]

The diagram shows the dynamic wheel supported in a vertical plane on a laboratory cart. A stroboscopic lamp (STROBE), energized from a signal generator (SIG GEN) through a synchronous controller which included a rotating drum, directed its light toward the face of the wheel opposite the cart. A fluorescent lamp, energized from a power source (PS) but subject to imposition of 12,000 c. p. s. modulation from an oscillator (12KC OSC) through a modulator (MOD) under control of the synchronous controller, was also directed toward the face of the wheel.

The wheel itself comprised a circular metal disc about 30 inches in diameter. Its mounting on the cart was through a special bearing which supported the wheel at a single point on its axis. The mounting normally allowed spinning of the wheel in a vertical plane as shown, but the bearing had a spherical inner race which permitted the wheel to be tilted to some degree in any direction relative to that plane.

On the face of the wheel disposed toward the lamp was a toroidal tank containing nitrogen gas under pressure, a jet nozzle directed along a line parallel to the axis of the wheel and positioned at a location offset from that axis, and a valve controlling admission of gas from the tank to the nozzle. Also disposed on the face of the wheel was a control device, responsive to light resulting from 12,000 c. p. s. modulation of the energy to the fluorescent lamp, to open the valve to the nozzle during such modulation. The device was made responsive to 12,000 c. p. s. modulation in order to enable it to differentiate between light signals from the lamp and light from other sources. The wheel face included spokes on one of which was a mark in the form of a wide arrow pointing radially outwardly toward an X.

In the tests, the dynamic wheel was brought up to spin speed of about 165 r. p. m. by hand and then a speed sustaining jet system, required to overcome the friction of the bearing and the drag of the air in the laboratory and not part of the invention, was activated to maintain the spin speed constant. The equipment was brought into synchronism by adjusting the speed of the drum of the synchronous controller to match the speed of the wheel so that the stroboscopic light emitted a brief high intensity flash once per revolution of the wheel, thus making the arrow and X mark appear stationary at a radial position. By another adjustment of the controller, the operator was able to apply 12,000 cycle modulations to the fluorescent lamp during a selected portion of each revolution of the wheel. Since the jet was operated by signals from the fluorescent lamp, the portion of the revolution selected determined the direction of precession of the wheel in a predictable manner.

During the test, the fact that the wheel was spin-stabilized was demonstrated by moving the car from side to side and observing that the wheel remained in the same position.

### The Prototype Comsat Satellite

The prototype Comsat satellite built by appellants, which was apparently intended to be usable as an operating satellite, included elements of the attitude control system in substantially the form disclosed in the application. It was not tested to show operability of the overall system under dynamic conditions, but it was widely exhibited and components of it were subjected to extensive testing prior to the contract date of August 21, 1961. Tanks for the high pressure gas system were pressure tested. Jet valves were tested by life cycling, by determining other operating characteristics and by subjecting them to temperature, vacuum, vibration and shock tests.

### The Board's Opinion

Before the board, appellee contended that the dynamic wheel structure tested by appellants did not meet the recitation in section (e) of claim 19, *supra*, and similar recitations in claims 20 and 21. The board ruled adversely on that contention, concluding that the claims "encompass within their broad terms, and read on, the structure of the dynamic wheel * * *."

In ruling that appellants' tests nevertheless did not demonstrate actual reduction to practice, the board held that the application disclosure extends "only to *free* spinning bodies, acting like gyroscopes, that are wholly unrestrained by any physical structure tending to limit or control the application of external forces to them or their response to such force[s]" (emphasis board's). The board was not persuaded by arguments of appellants that the invention was in fact applicable to "any gyroscope" or to conventional gyroscope apparatus. Considering the tests of the dynamic wheel in the light in which it viewed the invention, the board held:

The tests did not duplicate or simulate the essential conditions of any contemplated functional setting of the invention. There is no evidence that establishes a relationship between the

tests that were performed and any intended functional setting within the disclosure of the Williams application, nor does the record prove such a relationship between the tests that were performed and any other contemplated use or functional setting.

### Opinion

#### Application of the Claims to the Dynamic Wheel

Appellee urges that the board erred in holding that the structure employed in the dynamic wheel tests complied with the claim recitations exemplified by the following language in claim 19, *supra*:

(e) means disposed on said body for providing an indication to a location external to said body of the instantaneous spin angle position of said body about said [spin] axis and the orientation of said [spin] axis with reference to a fixed external coordinate system.

██ That language requires the *indication* of two conditions. As the board observed, it does *not* call for transmitting any signals. The board held and we agree that the spin angle position was clearly indicated by the arrow and X mark on the wheel spoke when viewed from an external location under the stroboscopic light which made that mark appear stationary at a particular angular position. The real question is whether the part played by the stroboscopic light equipment prevented the test apparatus from meeting the limitation that the "means" for providing the indication be "disposed on" the body. The arguments of the parties based on the claim terminology alone do not resolve this question to our complete satisfaction but lead instead to the conclusion that the recitation is ambiguous. In interference proceedings, ambiguity calls for recourse to the case of origin of the language for resolution. Smith v. Wehn, 318 F.2d 325, 50 CCPA 1544 (1963). We think that ambiguity must be similarly resolved in this case. Re-

ferring then to the Williams application, the only "means" disclosed for providing the indication in question involves solar sensors which, while "disposed on" the body, function only through cooperation with the sun, which of course is not so disposed. The recitation in question must therefore be given its broadest reasonable interpretation to include means which, while on the body, receive outside assistance in providing the indication. So construed, the recitation finds full response in the arrow and X mark so far as the function of providing an indication of instantaneous spin angle position is concerned.

██ As to means for indicating the orientation of the spin axis, anyone viewing Exhibit 4, the film of the wheel in operation in 1960, would see that the wheel was precessed in various directions from its original position. The orientation at any time was apparent from observation of various observable parts of the wheel. While we agree with the board that front and back plates on the wheel were such means, we also think that the arrow and X mark were observable as an indication of the *orientation* of the wheel. The apparatus used in the dynamic wheel test therefore provided both indicating functions defined in the recitations in issue and the board did not err in so holding.

### Appellants' Tests

██ Where an interference count does not specify a use for the claimed invention, evidence proving substantial utility for any purpose is sufficient to establish reduction to practice. Blickstein v. Seiden, 378 F.2d 988, 54 CCPA 1532 (1967). Obviously that proposition is also applicable to proceedings under § 305(d) and applies to the claims here which do not specify a use. Appellants argue that the present invention is merely an improvement in precessing mechanisms which could be substituted in old or conventional gyroscope structure, referring to certain prior art pat-

ents of record.[3] The board, faced with a similar argument, held that it was not apparent from the record that the invention had utility in such conventional prior art apparatus or that Williams ever contemplated any such use, particularly at the time of the tests in 1960. The board emphasized that the specific disclosure of use of the invention in the application was for orienting a communications relay satellite in orbit about the earth. It also noted that the only other uses suggested in the application are with a spin stabilized body such as "a target seeking vehicle," other types of satellites such as "meteorological, astronomical or navigational satellites" and "vehicles for probing into space and for intercepting other space vehicles." Those circumstances led the board to conclude that the sufficiency of appellants' tests must be determined on the basis of suitability of the claimed invention for use with "*free*, spinning bodies, acting like gyroscopes, that are wholly unrestrained by any physical structure tending to limit or control the application of external forces to them or their response to such force[s]." We find no *occasion for ruling on appellants' conten*tion regarding use of the invention in conventional gyroscope structure since we are convinced that appellants must prevail in any event because their tests made prior to the NASA contract of August 1961 proved substantial utility of the invention for use with free spinning bodies as described in the application.

In essence, the invention is directed to a spinning body operated by remote control from a location external to the body to pulse a nozzle at a selected position in successive spin cycles to precess the body in a selected direction.[4] The re-

mote control link between the body and the external location was a radio system described very broadly in the application. It is apparent from the record that the prior art in that area was already well developed. Only the feasibility of the combination of the pulsed jet precessing means with external monitoring and controlling means, as broadly recited in the claims, was left to be proven.

We think that the dynamic wheel tests did prove out that combination. Appellants' witness Rosen, a highly skilled scientist who was manager of Hughes' Comsat program, testified:

> I think the main interesting result of those tests were, first of all, to demonstrate that precession pulses could be applied to the spinning vehicle, and secondly, that the nutation [5], which is an incidental effect of pulsing, applying the pulse torque to the satellite, did not build up to undesired proportions, that is, it was negligibly small.

Williams testified that the dynamic wheel tests demonstrated the validity of his pulsed jet arrangement for precessing and that this was evident in the movie of the dynamic wheel test (Exhibit 4) which was shown to NASA officials and officials of the Army Signal Corps about June or July of 1960. He further stated:

> At the time there was considerable skepticism as to the operability of this concept. In fact, at one meeting with the Army, one of the Army representatives said, "We have studies from one of our contractors that show that this is impossible." Then we showed them the film, and they agreed their contractors must have made an error.

---

3. U.S. patents No. 2,795,956, issued June 18, 1957, to McNatt; No. 2,492,057, issued December 20, 1949, to Noxon; No. 2,772,570, issued December 4, 1956, to Judson; and No. 2,780,104, issued February 5, 1957 to Carlson.

4. McLean patent No. 3,216,674, issued November 9, 1965, on an application filed June 8, 1959, and cited in the prosecution of the Williams application, dis-

closes a spin-stabilized, target-seeking space vehicle provided with a jet motor at its outer periphery, which motor is controlled by sensing means on the vehicle to automatically precess the vehicle to keep its spin axis in a desired relationship to the target.

5. The witness described "nutation" as a "*wobbling type of motion*."

In concluding that the tests did not duplicate or simulate any contemplated functional setting of the invention, the board's reasoning was:

[T]he tests of the dynamic wheel were limited to tests in an environment of typical laboratory temperature, an estimated 70 degrees with average humidity and an atmospheric pressure incidental to an estimated 100 feet of altitude. There were no other tests, such as vibration on the dynamic wheel. No quantitative measurements were made of the degrees of precession of the spin axis on the wheel that were obtained. There was control of the orientation of the spin axis of the body only in the sense that the precession of that axis, as mechanically restricted by the ball joint supporting the wheel, occurred in the direction that was sought by the operator through the application of the jet forces directly on the rotating wheel itself at preselected instantaneous spin angle positions of the wheel and in synchronism with the wheel rotation.

■ We find nothing in the record which would indicate that the factors referred to by the board were such as to raise any significant doubts that the precessing system proved out in the dynamic wheel tests would be operative with a spinning body used as described in the application. Nor did the board advance any reasoning to support such doubts.[6] In their petition for reconsideration, in particular, appellants pointed out that some target seeking vehicles op-

erate near the earth where temperature, humidity and pressure conditions approximate those in the laboratory where the dynamic wheel was tested. They also pointed out that space is a benign environment and that a satellite in orbit is not normally subjected to shock and vibration. No reason is apparent from the record why a *free* spinning body would not be expected to precess in response to pulses from the jet nozzle in the manner demonstrated on the dynamic wheel tests or why there would be a limitation on the degree of precession obtainable.

■ A significant, and often controlling, consideration in determining the sufficiency of tests for reduction to practice lies in whether the tests show that the invention will serve the purpose for which it is intended so conclusively that practical men, men skilled in the art, would take the risk of putting it into commercial use. Larsen v. Marzall, 90 U.S.App.D.C. 260, 195 F.2d 200, 92 USPQ 306 (1952); Farrand Optical Co. v. United States, 325 F.2d 328 (2 Cir. 1963); Goodrich v. Harmsen, 442 F.2d 377, 58 CCPA 1144 (1971). Viewed in light of the impression made on those skilled in the art, appellants' tests unquestionably met the requirements for actual reduction to practice. Hughes' experts promptly adapted the present attitude control system in place of a different system originally planned for its Comsat program, which it was offering to government agencies and others.[7] NASA, obviously as the result of consid-

---

6. We note that, with the exception of humidity, the environmental tests the board thought should have been made closely parallel the tests run on the components of the Comsat prototype discussed *supra*. However, those tests appear to have been primarily in the nature of design work directed to commercialization of the product in which the attitude control system was regarded as already proven out by the dynamic wheel tests. It is well established that suitability for commercial use is not a requirement for reduction to practice. Hradel v. Griffith, 367 F.2d 851, 54 CCPA 911 (1966). The board advanced no reason why any

aspect of the attitude control system would be adversely effected by a lack of humidity, and none is apparent to us.

7. In March of 1961, James C. Fletcher, a recognized expert in space technology who is presently the Administrator of NASA, evaluated the Hughes program as a consultant for the Defense Department. In a report made after an investigation that included viewing the film of the dynamic wheel tests, Exhibit 4, he expressed no reservations about the attitude control system because, as he testified later, he thought it was "in excellent shape."

eration by its technical staff and advisors of the program and the Hughes activities under it, including the dynamic wheel test, entered into the 1961 contract for the Syncom program at the risk of millions of dollars.

■ For the above reasons, we conclude that the invention was actually reduced to practice before, and outside of, the NASA contract and that the board's determination to the contrary was erroneous.

### The Board's Procedure

Upon declaration of the present proceeding under section 305(d), the board set a pre-testimony period "for any preparatory activities the parties may consider appropriate such as the filing of motions, [and] consideration by the parties of the best mode of presenting their cases when testimony times are set * * *." In response to a motion by appellants, the board ruled that the statute had "not yet operated to pass title to the invention to the United States." It further ruled that appellants, as the party having control of the evidence relative to the work under the contract with NASA, had the burden of establishing the facts concerning conception and reduction to practice, although it stated that the burden of going forward with the evidence would fall on the Administrator under certain circumstances. Appellants protest the procedure followed by the board, particularly as to what they regard as placing the original burden of proof on them.

■ We start with the observations that the statute says nothing about which party bears the burden of proof on any issue, and the board has not come up with any interference rules which would govern this case by analogy. We think the wisest course to follow is to fall back to the basic tenets of the law of evidence, three of which should control here—(1) the burden of proof generally lies on the party asserting the affirmative of a proposition, 9 Wigmore on Evidence, § 2486 (3d ed. 1940) or the party seeking to change the present state of affairs, McCormick, Evidence, § 337 (2d ed. 1972); (2) where a party is in a position to have peculiar knowledge of the facts with regard to an issue, the burden of proof as to that issue lies upon that party, *id.*; and (3) the burden of going forward with the evidence on an issue generally rests upon the party having the burden of proof on that issue. McCormick, Evidence, § 337, *supra*, 9 Wigmore on Evidence, *supra*, § 2487. Section 305 clearly treats an invention as property, the right to which is in the inventor or his assignee unless the invention was made (conception or first actual reduction to practice) in the performance of work under a NASA contract. As the board ruled here, title to the application remains in the applicant (or assignee) at the time of declaration of the § 305(d) proceeding. The question to be decided through the hearing under § 305(d) is "whether the Administrator is entitled * * * to receive * * * [the] patent on the involved application." We think that the Administrator should bear the general burden of proving that he is so entitled, *i. e.*, he should bear the general burden of proof as to the acts which he alleges [8] took place under the contract and which would entitle the United States to the patent.[9] This does not mean that the board erroneously as-

---

8. The board required the Administrator to file a statement identifying any contract relied upon and stating whether reliance was in connection with conception or actual reduction to practice in Hammer v. Administrator, 167 USPQ 57 (Bd. Pat.Intfs.1970). The record does not show that any such requirement was made in this case.

9. We thus disagree with the position taken by the board in Rosen v. Administrator, 152 USPQ 757 (Bd.Pat.Intfs.1966) that:
[I]f no evidence is presented in a proceeding of the nature before us, it would appear to be tantamount to an applicant's failure to request a hearing before us (under section 305(d)) in which case the statute is clear that the Commissioner "shall issue such patent to the Administrator * * *."

signed the burden of proof in the present case however. In the case at bar, it cannot be seriously questioned that the launching and maneuvering of Syncom II took place, or that it demonstrated *an* actual reduction to practice of the invention.[10] This case was concerned with what happened prior to and *outside of* the contract—events occurring under the control of the inventor, the facts surrounding which *he* is in a position to know and NASA is *not* in a position to know. We feel that acts such as those shown here, should be treated as affirmative defenses, and the burden of proof must be placed on the inventor. It may well be that the established rules of evidence do not fit every case arising under § 305, but any such situations must be dealt with as they arise.

In summary, we find that the board erred in finding that appellants had not proved that the invention was actually reduced to practice prior to the time the NASA contract was entered into. Therefore, its decision is reversed.

Reversed.

10. Appellants do devote a part of their reply brief to a denial that they admitted such a reduction to practice but the position taken there borders on the unreasonable and we do not consider it a serious denial that the launching and maneuvering of Syncom II was an actual reduction to practice.