**HUGHES AIRCRAFT COMPANY,**
Appellant,

v.

**The UNITED STATES, Appellee.**

**Appeal No. 426–73.**

United States Court of Appeals,
Federal Circuit.

Sept. 20, 1983.

---

**15.** *See Facius,* 408 F.2d at 1407, 161 USPQ at 302.

Philip W. Tone, Chicago, Ill., argued for appellant. With him on the brief were Sheldon Karon, Victor G. Savikas, Thomas D. Rosenwein, Dugald S. McDougall, Keith V. Rockey, Chicago, Ill., and John A. Sarjeant, El Segundo, Cal.

James D. Stokes, Jr., Washington, D.C., argued for appellee. With him on the brief were J. Paul McGrath, Asst. Atty. Gen., Vito J. DiPietro, Director and Thomas J. Byrnes, Washington, D.C., of counsel.

Before MARKEY, Chief Judge, and DAVIS and BALDWIN, Circuit Judges.

MARKEY, Chief Judge.

Hughes Aircraft Company (Hughes) appeals that part of a judgment [1] of the United States Claims Court finding non-infringement of U.S. patent No. 3,758,051 (the Williams patent) by the government's "store and execute" (S/E) spacecraft. The government appeals that part of the judgment holding claims 1, 2, and 3 of the patent valid. We affirm-in-part, reverse-in-part, and remand for a determination of the quantum of recovery for infringement by the accused SKYNET II, NATO II, DSCS II, IMP (H and J), SOLRAD (9 and 10), and PIONEER (10 and 11) [2] spacecraft.

The Williams patent for "Velocity Control and Orientation of a Spin-Stabilized Body", issued to Donald D. Williams on September 11, 1973, on application serial No. 391,187, filed August 21, 1964, a continuation-in-part of now-abandoned application serial No. 22,733, filed April 18, 1960.

### Background

Throughout the late 1950's and early 1960's, the Department of Defense and the National Aeronautics and Space Administration (NASA) engaged in an intense effort to build a synchronous communications satellite with an orbital period equalling the rotational period of the earth. The goal was a satellite moving in a west-to-east orbit with a radius of 22,750 nautical miles and having a linear velocity of 10,090 feet per second, so that it could "hover" above a fixed point on earth.

Despite huge expenditures, the government never solved the technical problem of attitude control. That problem is described as the need to orient the satellite in space, without exceeding weight limitations, while insuring that (1) its directional antennas were always pointed toward the earth, and (2) that it would obtain a reliable, adequate fuel supply from the sun.

---

1. Pursuant to an October 4, 1982 order of this court, the trial judge entered a final judgment on October 8, 1982, corresponding to the decision recommended in this case.

2. PIONEER, initially expected to function for 21 months, continued its galactic journey for 11 years. It has recently become the first man-made structure known to have entered "deep" space as it continues its journey toward infinity. *Washington Post,* June 13, 1983.

Working for Hughes, Williams solved the problem. He created a practical system for attitude control of a spin-stabilized satellite. In the Williams system, signals sent by a ground crew control the satellite by causing a jet on the satellite to pulse at a selected satellite position in successive spin cycles, thereby "precessing" the satellite in a selected direction. Williams taught how a jet valve on the satellite's periphery could discharge gas in brief, successive pulses on command. He taught that an on-board V-beam sun sensor (vertical slit and canted slit) could collect raw data from the sun and transmit it to earth, enabling a ground crew to determine the satellite's existing and desired orientations.

When, using conventional radio signals, the ground crew pulses the attitude jet, torque is applied to the satellite and its spin axis is "precessed" parallel to the earth's axis, causing the beam of the satellite's antenna to point to the earth continuously during the 24-hour period of each orbit, and insuring that the satellite's solar cells receive maximum light from the sun.

The Williams Satellite

On April 2, 1960, Williams successfully operated a laboratory model, known as the "dynamic wheel", in demonstration of his invention. *See Williams v. Administrator of NASA*, 463 F.2d 1391, 1395–96, 175 USPQ 5, 8–9 (Cust. & Pat.App.1972), *cert. denied*, 412 U.S. 950, 93 S.Ct. 3013, 37 L.Ed.2d 1003 (1973).

Hughes disclosed the invention to NASA, seeking its participation in building a satellite with the unique attitude control system. In its "Sole Source Justification", NASA stated:

Hughes has submitted the only proposal to NASA indicating that a 24-hour lightweight synchronous satellite having

a two-way voice communication capability is practicable. This design is achieved through the use of a unique attitude and orbital velocity vernier system which allows an optimized communication system to meet the requirements for two-way voice communication within the weight limitations.

Utilization of the development team and design approaches established at Hughes will result in a savings in time and money to the Government. It is therefore recommended that a sole source procurement of a spacecraft for Project SYNCOM be awarded to Hughes Aircraft Corporation.

In August, 1961, Hughes and NASA entered a contract for engineering and construction of the SYNCOM satellite. On July 26, 1963, SYNCOM II, the world's first synchronous communications satellite, was launched and placed in orbit. On July 31, 1963, the attitude control system was successfully employed and radio transmission continued 24 hours per day.

On April 18, 1960, Williams had filed the parent application of that which resulted in the Williams patent. The examiner allowed some claims, but rejected others based on prior art and an inadequate disclosure of ground control apparatus. Williams' proffered amendments were denied entry as containing new matter.

On August 21, 1964, Williams filed a continuation-in-part (CIP) application. The CIP added to the parent disclosure a Figure 12 and a description of the structure it illustrated, *i.e.*, a ground-based analog controller for synchronizing the force applied to the satellite with the satellite's spin cycle.

On January 10, 1966, the examiner rejected all claims under 35 U.S.C. § 103 as unpatentable over earlier cited art and newly cited U.S. patent No. 3,216,674 entitled "Proportional Navigation System for a Spinning Body in Free Space", issued November 9, 1965 to McLean and disclosing a spin-stabilized, target-seeking space vehicle having a jet motor on its periphery. The motor, controlled by an infrared sensor, automatically precessed the vehicle to keep its spin axis pointed toward the target.

The McLean vehicle for steering a collision course to a target is self-contained and self-guiding. When the target is aligned with the vehicle's spin axis, photodetector 22 detects a constant infrared radiation, producing a constant signal. If the target moves from alignment, detector 22 provides an alternating signal, to fire precessing jet 16 at the point in the vehicle's spin cycle that will precess the spin axis back toward the target.

OXIDIZER TANK

ELECTRONIC DEVICE

PHOTOCELL

ANTENNA

PRECESSING JET

SOLENOID OPERATED VALVE AND FUEL COMBUSTION CHAMBER

DIRECTION OF SPIN

OXIDIZER LINE

FUEL LINE

LATERAL JET

PRIMARY MIRROR

RETICLE

FUEL TANK

SECONDARY MIRROR

ANTENNA

NUTATION DAMPER

FIG. I.

## The McLean Space Vehicle

By amendment filed April 29, 1966, Williams canceled the rejected broad claims and inserted three independent claims that became claims 1–3 of the patent in suit. Representative claim 1 reads:

1. Apparatus comprising:

a. a body adapted to spin about an axis;

b. fluid supply means associated with said body;

c. a valve connected to said fluid supply means;

d. fluid expulsion means disposed on said body and coupled with said valve and oriented to expel said fluid substantially along a line parallel to said axis and separated therefrom;

e. means disposed on said body for providing an indication to a location external to said body of the instantaneous spin angle position of said body about said axis and the orientation of said axis with reference to a fixed external coordinate system;

f. and means disposed on said body for receiving from said location control signals synchronized with said indication;

g. said valve being coupled to said last-named means and responsive to said control signals for applying fluid to said fluid expulsion means in synchronism therewith for precessing said body to orient said axis in a predetermined desired relationship with said fixed external coordinate system.

In accompanying remarks, Williams said "[t]hese claims were re-written ... so that the claims more clearly distinguish over the newly-cited reference, McLean" and "[a]s to McLean, he does not teach or suggest the elements and relationships set out in [para-

graphs (e), (f), and (g) ]''. Placing emphasis on paragraph (e), Williams said: "McLean's infrared telescope does not indicate the instantaneous spin angle position of his body *with reference to a fixed external coordinate system, and it does not indicate the orientation of the axis with reference to a fixed external coordinate system.* [Emphasis in original.]'' On May 4, 1966, the examiner allowed the claims.

The Administrator of NASA asserted that he was entitled to receive the patent, on behalf of the United States, pursuant to § 305 of the National Aeronautics and Space Act, 42 U.S.C. § 2457. The Patent Office Board of Patent Interferences agreed, viewing the launching and maneuvering of SYNCOM II accomplished under government contract as constituting the first actual reduction to practice of the invention. The Court of Customs and Patent Appeals reversed, holding that the earlier, successful operation of the "dynamic wheel" had

> unquestionably met the requirements for actual reduction to practice. Hughes' experts promptly adapted the present attitude control system in place of a different system originally planned for its Comsat program, which it was offering to government agencies and others. NASA, obviously as the result of consideration by its technical staff and advisors of the program and the Hughes activities under it, including the dynamic wheel test, entered into the 1961 contract for the Syncom program at the risk of millions of dollars.
>
> For the above reasons, we conclude that the invention was actually reduced to practice before, and outside of, the NASA contract and that the board's determination to the contrary was errone-

ous. [*Williams v. Administrator of NASA,* 463 F.2d at 1399–1400, 175 USPQ at 11, footnote omitted.]

In the Administrator's brief in the Court of Customs and Patent Appeals, he referred to the Williams invention as "an invention in a sophisticated art, involving new and unobvious subject matter". In his Petition for Writ of Certiorari filed with the Supreme Court, he characterized the patent in suit as "an important patent on an invention used in space satellites".

On September 11, 1973, the Williams patent issued, with Hughes as assignee. On November 13, 1973, Hughes filed this action in the Court of Claims under 28 U.S.C. § 1498, seeking reasonable and entire compensation for the unauthorized manufacture or use by the United States of the claimed invention in the government's SKYNET II, NATO II, DSCS II, IMP (H and J), SOLRAD (9 and 10), and PIONEER (10 and 11) spacecraft. The government disputed validity and denied infringement.

The trial judge submitted a recommended decision and conclusion of law, *Hughes Aircraft Co. v. United States,* 205 USPQ 381 (Trial Div., Ct.Cl.1979), finding that: (1) the ground controller shown in Figure 12 of the patent was an element of all three claims; (2) those claims were restricted to the filing date of the CIP application and were not entitled to the benefit of the parent application's filing date, because the parent provided inadequate support under 35 U.S.C. §§ 120 and 112, first paragraph; and (3) the claims were invalid under 35 U.S.C. § 102(b), because the invention claimed had been described in a printed publication more than one year before the filing date of the CIP application.[3]

---

**3.** The relevant statutory provisions are:

*§ 120. Benefit of earlier filing date in the United States*

An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States, or as provided by section 363 of this title, by the same inventor shall have the same effect, as to such invention, as though

filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application.

*§ 112. Specification*

In *Hughes Aircraft Co. v. United States,* 640 F.2d 1193, 1195, 208 USPQ 785, 788 (1980), the Court of Claims rejected the trial judge's conclusion, stating "[t]he claims of the patent cover solely the orbiting satellite and no other object, device, means or apparatus." The court held that "The Williams patent is not invalid under 35 U.S.C. § 102(b)." The case was remanded for a recommended decision and findings on the other issues presented. *Id.* at 1199, 208 USPQ at 791.

### Decision on Remand

On September 1, 1982, the trial judge submitted a recommended decision and conclusion of law on remand. *Hughes Aircraft Company v. United States,* 215 USPQ 787. In an exhaustive opinion, he rejected the defense of invalidity under 35 U.S.C. § 112, held that the claimed subject matter would have been nonobvious under 35 U.S.C. § 103,[4] and found that the patent is infringed by the accused "real-time" spacecraft but not by the accused S/E spacecraft. Specifically, he found that claim 1 is infringed by the SOLRAD (9 and 10) and PIONEER (10 and 11) "real-time" spacecraft, and that no claim is infringed by the SKYNET II, NATO II, DSCS II, or IMP (H and J) S/E spacecraft.

The trial judge acknowledged the similarities between the S/E spacecraft and the Williams satellite:

The store and execute systems have many elements that are similar, if not identical, to the system described in the Williams patent. Each of the systems includes (1) a spin-stabilized spacecraft; (2) means for determining the orientation of the spin axis of the spacecraft from the earth; (3) means for signaling from the earth to the spacecraft that a change in orientation is desired; (4) a precession jet mounted on the spacecraft offset from the spin axis; and (5) means for pulsing the offset jet in synchronism with the spin of the spacecraft so that the spin axis is precessed in the desired direction. The Williams system includes all of these elements. [215 USPQ at 807]

Nonetheless, in concluding that no claim is infringed by the accused S/E spacecraft, he emphasized the literal language of the claims:

[I]t is basic in patent law that the claims ... define the scope of invention. 35 U.S.C. § 112, second paragraph. No matter how fair or equitable it may seem, a court cannot rewrite the claims. *Autogiro Co. of America v. United States,* 181 Ct.Cl. 55, 60, 384 F.2d 391, 396, 155 USPQ 697, 701 (1967). [215 USPQ at 807]

He found that Williams' claims require: (1) means for providing to an external location information sufficient to determine the instantaneous spin angle (ISA) position; and (2) means for pulsing the precession jet within a fixed time after receipt of a control signal from that location. Finding that the SKYNET II, NATO II, and DSCS II

---

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

§ 102. *Conditions for patentability; novelty and loss of right to patent*

A person shall be entitled to a patent unless—

. . .

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . .

4. 35 U.S.C. § 103 reads:

§ 103. *Conditions for patentability; non-obvious subject matter*

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

spacecraft contain neither of those requirements, and the IMP (H and J) spacecraft do not contain the latter, he concluded that no S/E spacecraft literally infringes the claims.

Respecting Hughes' reliance on the doctrine of equivalents, the trial judge said:

> As plaintiff included these elements in the claims to overcome the prior art [the McLean patent], plaintiff is now estopped from claiming that these elements are unnecessary to avoid the art

and

> In view of the file wrapper estoppel in this case, the doctrine of equivalents affords protection only against alleged infringers who use obvious and exact equivalents of the elements of the claimed invention. There is no obvious or exact equivalent of plaintiff's means for providing an indication of the ISA to an external location in either [sic] of the SKYNET II, NATO II or DSCS II systems. Nor is there an obvious or exact equivalent of the means for pulsing the precession jet within a fixed time period after the receipt of a control signal in any of the accused store and execute systems. [215 USPQ at 812]

Accordingly, he concluded that none of the accused S/E spacecraft infringes any of the Williams patent claims.

The government has not appealed from the judgment that the SOLRAD and PIONEER spacecraft infringe claim 1 of the patent in suit. It does argue invalidity of the Williams patent, however, and if the patent be held invalid, the infringement judgment would fall, liability for infringement of an invalid patent being non-existent in law.

### Issues

I. Whether the Williams patent is invalid because a parent application did not comply with 35 U.S.C. § 112, first paragraph.

II. Whether Williams' claimed subject matter would have been obvious, 35 U.S.C. § 103.

III. Whether Williams' claims are infringed by any of the accused "store and execute" spacecraft.

### OPINION

#### I. Validity

#### (A) *35 U.S.C. §§ 112, 120, 102(b)*

■ The government argument that the Williams patent is invalid because a parent application was not enabling under 35 U.S.C. § 112 relies on this language in the previous Court of Claims opinion, *Hughes Aircraft Co. v. United States,* 640 F.2d at 1198, 208 USPQ at 790:

> The problem with the original [parent] application with respect to the ground control device was not the failure to *claim* such a device (since it was not a part of the invention), but to give sufficient information regarding the ground control device to enable one skilled in the art to practice the invention.

> It was this deficiency in the information about the ground control device contained in the original application that the amplification of the specifications in the CIP application was designed to correct [Emphasis in original].

The government couches this defense in traditional terms, i.e., "failure to comply with § 112, first paragraph". It makes no effort however, nor could it, to show that the Williams *patent* fails to comply with § 112. As above indicated, it is necessary that Williams be entitled to his parent application's filing date under § 120, if he is to avoid the effect of the publication under § 102(b). The government, in asserting non-entitlement to the earlier date, is thus attempting to relitigate the § 102(b) issue. That it cannot do.

Whatever may be said of the language the government relies on, that language cannot be considered in a vacuum or out of context. The Court of Claims expressly held that "The Williams patent is not invalid under 35 U.S.C. § 102(b)", *Hughes,* 640 F.2d at 1199, 208 USPQ at 791. To avoid invalidity under § 102(b), the Williams patent must necessarily have been entitled to

the parent application's filing date, and, to be so entitled under 35 U.S.C. § 120, the parent must have been enabling under § 112 with respect to the invention set forth in the claims of the patent. The trial judge indicated that the invention referred to by the court in the government-cited language was not that set forth in the claims finally allowed. That language, moreover, may be viewed as premised on there having been sufficient enablement present in the parent application, the CIP having merely added an "amplification". In any event, we view the holding of the Court of Claims that the Williams patent is not invalid under § 102(b) as encompassing validity under § 112 and as the law of the case.

(B) *35 U.S.C. § 103*

▮▮▮ A patent shall be presumed valid and the burden of persuasion is and remains always on the party asserting invalidity. 35 U.S.C. § 282. *Stevenson v. ITC,* 612 F.2d 546, 551, 204 USPQ 276, 281 (Cust. & Pat.App.1979); *Solder Removal Co. v. ITC,* 582 F.2d 628, 632–33, 199 USPQ 129, 132–33 (Cust. & Pat.App.1978). The burden is less easily carried when the evidence relied upon consists only of the prior art considered by the examiner. *See Solder Removal,* 582 F.2d at 633, 199 USPQ at 133.

The government argues that because the subject matter of claims 1, 2, and 3 would have been obvious at the time the invention was made to a person having ordinary skill in the art, the Williams patent is invalid under 35 U.S.C. § 103. It relies heavily on the McLean patent considered by the examiner. The trial judge found, and the parties agree, that McLean is the most pertinent prior art. According to the government, McLean's space vehicle includes all elements recited in the claims except for a remote control capability, which it says would have been an obvious addition thereto.

As the trial judge noted, the argument fails because the premise is unsound, *i.e.,* "the device of McLean does not include all of the elements of the claims of Williams,

except for remote control." Among the elements not disclosed by McLean is that of paragraph (e) of claim 1:

e. means disposed on said body for providing an indication to a location external to said body of the instantaneous spin angle position of said body about said axis and the orientation of said axis with reference to a fixed external coordinate system;

The government cites the testimony of its expert, Peter G. Wilhelm, who, when asked to compare the language of (e) with McLean, said: "[N]either Williams nor McLean fits the classical definition of a coordinate system, a fixed external coordinate system. But to the extent that the Williams apparatus can determine its position in ... 'an external coordinate system', McLean does the equivalent. I see no difference in that." From that, the government says Williams and McLean each and to the same extent provide the indications recited in paragraph (e) of claim 1.

In *Hughes,* 640 F.2d at 1193, n. 1, 208 USPQ at 786, n. 1, the Court of Claims adopted most of the trial judge's findings. Adopted findings 33–62 (reproduced in *Hughes,* 640 F.2d at 1213–18, 208 USPQ at 803–07) establish that the Williams patent specification fully supports the claims, including the means recited in paragraph (e). Hence, Wilhelm's statement that Williams does not fit the claimed definition of a "fixed coordinate system" is erroneous.

Similarly, the government has not proven that McLean provides the recited indications, notwithstanding Wilhelm's indication to the contrary. The space vehicle of McLean maintains a collision course with a target, whereas the Williams satellite maintains its spin axis in an orientation parallel to the earth's spin axis while in synchronous orbit around the earth. The former, under internal control alone, automatically tracks a target, whereas the latter is controlled from the ground. Though both devices use a precessing jet on the periphery, pulsed synchronously with the spin cycle for changes in orientation, the differences in function lead to significant structural dif-

ferences. Those differences are reflected in the claim language.

In arguing that McLean's space vehicle provides the indications recited in paragraph (e), the government assumes that the position of the vehicle's center would be known for any given instant of time, and that McLean's target is a known star. Neither assumption is warranted by McLean's disclosure. If the assumptions be made, we nonetheless detect no error in the finding that McLean does not provide an indication of the orientation of his spin axis with reference to a fixed external coordinate system, when a spin axis is out of alignment with the target star. Unlike Williams, such indication is unnecessary for McLean to accomplish precession. As government witness Wilhelm stated: "[McLean] only really had the angle between his spin axis and the target. But in his case, that's all the information that he needs. He doesn't really have to work in an external coordinate system. He's only trying to aim a line, a target."

The government's argument to the contrary notwithstanding, Hughes did not misinform the Patent Office that the Williams V-beam sensor indicates spin axis orientation with reference to a fixed external coordinate system. As stated *supra,* findings made by the trial judge and adopted by the Court of Claims establish that Williams' disclosure of the V-beam sensor, coupled with the knowledge of one of ordinary skill in the art, supports the means recited in paragraph (e).

The government argues that the trial judge incorrectly interpreted McLean's teaching as restricted to a target-seeking vehicle in view of the McLean reissue patent (Re: 26,887, reissued May 19, 1970), broadly claiming a spin-stabilized vehicle under pulsed jet control. The argument is misplaced. McLean's *claims* added by reissue do broadly cover a spin-stabilized vehicle under pulsed jet control, but McLean's *disclosure* was not thereby changed. Whether Williams' claimed subject matter falls within the scope of McLean's reissue claims is irrelevant to the inquiry here un-

der 35 U.S.C. § 103. There is nothing inconsistent with issuance of broad claims to McLean and narrower claims to Williams. We agree with the trial judge that, as a prior art teaching applicable here, "the disclosure of the McLean reissue adds nothing of significance to what was disclosed in the original McLean patent."

Having concluded that the subject matter of claims 1, 2, and 3 would have been nonobvious in view of the most pertinent prior art, the trial judge found it unnecessary to consider the "secondary considerations" referred to in *Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966). Hughes points to the: (1) government's unsuccessful efforts to solve the attitude control problem, despite huge expenditures; (2) belief of experts that the problem could not be solved; (3) a long-felt need filled by the Williams invention; (4) commercial success; (5) government's protracted attempt to obtain title to the Williams patent; and (6) its admissions of non-obviousness during the title dispute. Those uncontested facts are additional evidence of nonobviousness, requiring no further discussion here.

*Conclusion on Validity*

We hold that the government has not proven the Williams patent invalid under 35 U.S.C. § 103.

II. Infringement

(A) *Literal Infringement*

In the "real-time" satellite disclosed by Williams, sun pulses (signals from the V-beam sun sensor) are transmitted to earth, enabling the ground crew to simulate the rotation of the satellite and to calculate the satellite's spin rate, sun angle, and ISA position, *i.e.,* the measure of where the satellite is in its spin cycle at any instant of time. The sun pulses are known in "real time" and are used as reference points by the ground crew in transmitting firing signals to the jet, causing it to fire immediately and to produce precession.

In the accused S/E spacecraft, sun pulses are transmitted, but to a computer on board

the spacecraft rather than to the ground. The computer calculates spin rate and transmits it to the ground. The computer also transmits sufficient information from which a ground crew can calculate the sun angle. With most S/E spacecraft, the ground crew does not know the spacecraft's ISA position. The ground crew does not need to know ISA position because the computer does and the ground crew knows the computer knows. With the IMP (H and J) spacecraft, sufficient information to determine ISA position is transmitted to ground, but is used for analyzing data from scientific experiments, not for attitude control.

The sun pulses present on S/E spacecraft provide reference points for firing the jet to effect precession just as they do in the Williams invention, but after, not upon, receipt from earth of spaced firing signals: (1) an "information" signal telling the on-board computer when in each revolution the jet should be fired and how many firings (one per revolution) should be made; and (2) an "execute" signal telling the computer when to begin firing.

The trial judge correctly found, and it is here undisputed, that there are only two distinctions in the structure of the claimed Williams satellite from that of the S/E spacecraft: (1) the SKYNET II, NATO II, and DSCS II spacecraft do not include Williams' means for providing to the ground crew an indication of ISA position, having substituted computer-retention of that information; and (2) in all S/E systems, Williams' means for receiving synchronized control signals for immediate execution are substituted for by an on-board computer for receiving control signals and storing them for later execution. Because the claims speak of means for "providing an indication" of ISA position "to a location external" to the satellite, and to means for receiving from the external location firing signals "synchronized with said indication", there can be no literal infringement. At trial, Hughes conceded the absence of literal infringement and predicated its case for infringement on the doctrine of equivalents.

(B) *Doctrine of Equivalents and Doctrine of File Wrapper Estoppel*

█ The doctrine of equivalents comes into play only when actual literal infringement is not present. Under the doctrine of equivalents, an accused product that does not literally infringe a structural claim may yet be found an infringement "if it performs substantially the same function in substantially the same way to obtain the same result" as the claimed product or process. *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950) (quoting from *Sanitary Refrigerator Co. v. Winters,* 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147). The doctrine is judicially devised to do equity. "Courts have also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing," *id.* 339 U.S. at 607, 70 S.Ct. at 856, and again, "The essence of the doctrine is that one may not practice a fraud on a patent," *id.* at 608, 70 S.Ct. at 856.

> As summarized by the Supreme Court: Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents.

*Id.* at 609, 70 S.Ct. at 856–57.

Hughes, having the burden of proving infringement by a preponderance of the evidence, *Roberts Dairy Co. v. United States,* 530 F.2d 1342, 1357, 182 USPQ 218, 227 (Trial Div., Ct.Cl.1974), *aff'd* 198 USPQ 383 (Ct.Cl.1976), characterizes as "inconsequential" the differences in operation of the claimed invention and the accused S/E spacecraft. It asserts that the Williams satellite and S/E spacecraft are "obvious and exact equivalents". Hughes argues that: (1) though sun pulses are not sent to the ground by the SKYNET II, NATO II,

or DSCS II spacecraft, they are retained in the on-board computer and used in the spacecraft for the same purpose as in Williams' "real-time" satellite, *i.e.,* as reference points to fire the precession jet; (2) respecting immediate and delayed firing, the Williams satellite and all S/E spacecraft require "synchronization of jet firing with spin position"; and (3) "[i]f there were doubt as to whether the S/E spacecraft are obvious and exact equivalents of Williams, the S/E spacecraft nevertheless fall within the broad range of equivalents to which the pioneer Williams patent is entitled."

Addressing the last argument first, we agree with the trial judge that Williams' invention is not of such "pioneer" status as to entitle the invention to the very broad range of equivalents to which pioneer inventions are normally entitled. McLean, not Williams, was the first to disclose the basic operational concept in which a pulsed jet is used to precess the spin axis of a spin-stabilized body. That does not mean, as discussed below, that the Williams invention is entitled to no range of equivalents. Nor is the Williams invention entitled only to that very narrow range of equivalents applicable to improvement patents in a crowded art.

■ Having chosen specific words of limitation to avoid the McLean disclosure, Hughes is estopped by the prosecution history of the application ("file wrapper estoppel"), from obtaining a claim interpretation so broad as to encompass the McLean structure, or to encompass all structures in which a pulsed jet is used to precess the spin axis of a spin-stabilized body. The doctrine of prosecution history estoppel precludes a patent owner from obtaining a claim construction that would resurrect subject matter surrendered during prosecution of his patent application. The estoppel applies to claim amendments to overcome rejections based on prior art, *Dwyer v. United States,* 357 F.2d 978, 984, 149 USPQ 133, 138 (Ct.Cl.1966), and to arguments submitted to obtain the patent, *Coleco Industries, Inc. v. ITC,* 573 F.2d 1247, 1257, 197 USPQ 472, 480 (Cust. & Pat.App.1978).

Williams did not, of course, surrender subject matter related to employment of an on-board computer to accomplish in a differently timed manner what is accomplished by his disclosed structure.

■ An applicant for patent is required to disclose the best mode then known to him for practicing his invention. 35 U.S.C. § 112. He is not required to predict all future developments which enable the practice of his invention in substantially the same way.

The trial judge correctly stated that Hughes is estopped from asserting that the elements of its claims "are unnecessary to avoid the art". The relevant consideration, however, is not whether the claims avoid the art but whether the accused S/E spacecraft are equivalents of the inventions set forth in the claims interpreted in light of the prior art. The government is not claiming that its S/E spacecraft are built and operated in accord with the prior art, or that it is merely following the teachings of McLean. If it had followed those teachings in constructing its S/E spacecraft, there is no question that the range of equivalents to which Williams' claimed invention is entitled could not be broad enough to encompass such spacecraft.

Some courts have expressed the view that virtually any amendment of the claims creates a "file wrapper estoppel" effective to bar all resort to the doctrine of equivalents, and to confine patentee "strictly to the letter of the limited claims granted," *Nationwide Chemical Corp. v. Wright,* 584 F.2d 714, 718–19 (5th Cir.1978); *Ekco Products Co. v. Chicago Metallic Manufacturing Co.,* 347 F.2d 453, 455 (7th Cir.1965). We, as has the Supreme Court, reject that view as a wooden application of estoppel, negating entirely the doctrine of equivalents and limiting determination of the infringement issue to consideration of *literal* infringement alone. That view, as above indicated, fails to recognize that the doctrine of equivalents is unnecessary when literal infringement is present and is contrary to the guidance provided by the Supreme Court in *Graver,* supra.

Amendment of claims is a common practice in prosecution of patent applications. No reason or warrant exists for limiting application of the doctrine of equivalents to those comparatively few claims allowed exactly as originally filed and never amended. Amendments may be of different types and may serve different functions. Depending on the nature and purpose of an amendment, it may have a limiting effect within a spectrum ranging from great to small to zero. The effect may or may not be fatal to application of a range of equivalents broad enough to encompass a particular accused product. It is not fatal to application of the doctrine itself.

We adhere to the view expressed by our predecessor court in *Autogiro Co. of America v. United States,* 384 F.2d 391, 155 USPQ 697 (Ct.Cl.1967), and in *Garrett Corp. v. United States,* 422 F.2d 874, 164 USPQ 521 (Ct.Cl.), *cert. denied,* 400 U.S. 951, 91 S.Ct. 242, 27 L.Ed.2d 257 (1970). Discussing the relationship between the doctrines in *Autogiro,* the Court of Claims said:

> The doctrine of equivalence is subservient to file wrapper estoppel. It may not include within its range anything that would vitiate limitations expressed before the Patent Office. Thus a patent that has been severely limited to avoid the prior art will only have a small range between it and the point beyond which it violates file wrapper estoppel [Citations omitted].

384 F.2d at 400–01; 155 USPQ at 705.

Referring to the April 29, 1966 amendment described above, Hughes says: "All that Williams surrendered in order to avoid the prior art cited by the examiner were any claims that could be construed as applying to an automatic attitude control system not controllable from earth ... [the] amendment did nothing but more accurately claim ground controllability as the point of novelty." We disagree. In that amendment, Williams did not submit claims broadly covering all ground controllable spacecraft, as he might have. Had he done so, and had such claims been allowed, literal infringement would have been present here.

At the same time, Williams' amendment of the claims did not relate to any disclosure, in the prior art or elsewhere, in which the ISA position was stored in a computer along with command signals for later execution. Though we cannot agree that Williams' amendment left room for encompassing all ground-controlled spacecraft, it remains true that the operation of the Williams and S/E spacecraft involve control input from a ground crew, and McLean does not. That is an important consideration in applying the doctrine of equivalents. It does not *alone* establish infringement under that doctrine.

*Application of the Doctrine of Equivalents*

■ The issue, as above indicated, is whether the accused S/E spacecraft infringe the claims under the doctrine of equivalents. That question turns on whether the S/E spacecraft employ substantially the same means which "perform substantially the same function" as that performed by the claimed invention, and do so "in substantially the same way" the claimed invention does, and "obtain the same result" as that obtained by the claimed invention.

In his opinion, exhaustive in respect of other issues, the trial judge treated the subject of equivalency in a single conclusory paragraph:

> There is no obvious or exact equivalent of plaintiff's means for providing an indication of the ISA to an external location in either of the SKYNET II, NATO II or DSCS II systems. Nor is there an obvious or exact equivalent of the means for pulsing the precession jet within a fixed time period after the receipt of a control signal in any of the accused store and execute systems.

The trial judge declined to supply reasoning in support of that conclusion and did not apply the "substantially the same function, in substantially the same way, to obtain the same result" guidance set forth in *Graver,* supra. He also declined, as have the parties here, the opportunity to define "obvious or exact equivalent". That phrase

is not defined, moreover, in the case on which he relied, *Eastern Rotorcraft Corp. v. United States,* 397 F.2d 978, 982, 154 USPQ 43, 46 (Trial Div., Ct.Cl.1967), aff'd 158 USPQ 294 (Ct.Cl.1968), or in the case cited therein, *Southern Textile Machinery Co. v. United Hosiery Mills Corp.,* 33 F.2d 862, 866, 2 USPQ 183, 186 (6th Cir.1929). Neither the trial judge nor the government, for example, has explained why employment of the now-well-known store and execute capabilities of a computer was not an employment of substantially the same means or an "obvious" equivalent, or why the performance thereby of the functions of the Williams' claimed elements did not render the S/E spacecraft "exact" equivalents.

However the phrase "obvious and exact equivalents" may be defined, it was effectively and improperly applied here as a substitute for literal infringement, the absence of which was conceded. The failure to apply the doctrine of equivalents to the claimed invention as a whole, and the accompanying demand for "obvious and exact" equivalents of two elements the presence of which would have effectively produced literal infringement, was error.

In *Eastern Rotorcraft,* the Court of Claims afforded the patentee a limited application of the doctrine of equivalents, concluding that the range of equivalents of the claimed invention there encompassed the accused device. We hold that the trial judge erred as a matter of law in not so interpreting the scope of Williams' claims 1, 2, and 3 in their entirety, and in applying an appropriate range of equivalents to the entirety of the accused S/E spacecraft.

There are striking overall similarities between Williams' claimed satellite and the S/E spacecraft: (1) each is spin-stabilized; (2) each contains a jet on the periphery, connected by a valve to a tank containing fluid for expulsion substantially parallel to the spin axis; (3) each employs sun sensors to sense ISA position; (4) each requires knowledge of orientation relative to a fixed external coordinate system; (5) each contains radio equipment for communicating with the ground; (6) each transmits spin rate and sun angle information to a ground crew; and (7) in each, jet firing is synchronized with ISA position to effect controlled precession and thus to achieve a desired orientation. Only elements (1) and (2) are found in McLean. Clearly, the S/E spacecraft are much closer to Williams' satellite than they are to McLean's space vehicle. It is clear also that, in constructing its S/E spacecraft, the government followed the teachings of Williams much more than it did those of McLean. In following Williams' teachings, the government merely employed a modern day computer to do indirectly what Williams taught it to do directly.

The dispute as presented centers on what appears in paragraphs (e), (f), and (g), of representative claim 1:

e. means disposed on said body for providing an indication to a location external to said body of the instantaneous spin angle position of said body about said axis and the orientation of said axis with reference to a fixed external coordinate system;

f. and means disposed on said body for receiving from said location control signals synchronized with said indication;

g. said valve being coupled to said last-named means and responsive to said control signals for applying fluid to said fluid expulsion means in synchronism therewith for precessing said body to orient said axis in a predetermined desired relationship with said fixed external coordinate system.

*Paragraph (e) "providing an indication"*

Based on the testimony of its expert, Arthur E. Bryson, Jr., Hughes argues that the S/E spacecraft, with the ISA position indication retained on-board, are equivalents of Williams' claimed satellite, with the ISA position indication sent to ground, performance of the function involving the ISA position being substantially the same in each. We agree. Once an on-board computer became available, as Bryson said,

"any intelligent engineer designing this [S/E] system would say 'Look, I don't need to send the value of that ISA position to the ground, it's right there in the spacecraft. I'll just key my firing signal to that on board the spacecraft'."

The S/E spacecraft are identical with the Williams satellite, except for the employment of sophisticated, post-Williams equipment (computers) to achieve attitude control in the basic manner taught by Williams. Advanced computers and digital communications techniques developed since Williams permit doing on-board a *part* of what Williams taught as done on the ground. As one of our predecessor courts, the Court of Claims, has thrice made clear, that partial variation in technique, an embellishment made possible by post-Williams technology, does not allow the accused spacecraft to escape the "web of infringement". *Bendix Corp. v. United States,* 600 F.2d 1364, 1382, 204 USPQ 617, 631 (Ct.Cl. 1979); *see Decca Ltd. v. United States,* 544 F.2d 1070, 1080–81, 191 USPQ 439, 447–48 (Ct.Cl.1976); *Eastern Rotorcraft Corp. v. United States,* 397 F.2d at 981, 154 USPQ at 45.

That an appropriate range of equivalents of the claims extends beyond devices that send the ISA position indication to ground is consistent with Williams' patent specification:

> As an example of one means of controlling the starting time and duration of pulses to the jet control valves ... in such a way as to result in thrust during the correct portion of each spin revolution, cam-controlled contacts or switches may be used.

In the operation of the S/E spacecraft, the information that is transmitted to the ground crew, to enable them to determine and provide thrust during "the correct portion of each spin revolution", is the modern-day equivalent of sending the ISA position indication to the ground for that same purpose in Williams. Put another way, retention of the ISA position in an on-board computer, while transmitting sufficient information to enable the ground crew to use that computer-retained information to control the satellite, is the modern-day equivalent of providing an indication of ISA to ground as taught by Williams.

The government asserts only that its S/E spacecraft do not send an indication of the ISA position to the ground. That argument is clearly effective against an allegation of literal infringement, for if the S/E spacecraft *did* send an ISA position to the ground, literal infringement of that element of the claims would be clear. Williams controls his satellite, and the government controls its S/E spacecraft, from the ground. That Williams does so in "real time" and the government does so in a delayed reaction made possible by the advent of computers does not establish that the S/E spacecraft do not perform the same function in substantially the same way to obtain the same result.

### Paragraphs (f) & (g) "direct" vs. "indirect" firing

The distinction emphasized by the government between "direct" firing and its own "indirect" firing, phrased also as a distinction between "external" and "internal" synchronization of command signals with ISA position, and as a distinction between firing in "fixed" time and in "computer-set" time, rests on the government's use of modern memory circuits on-board S/E spacecraft to store commands for later use. As above indicated, mere substitution of an embellishment made possible by post-Williams technology does not avoid infringement. *See Bendix Corp., Decca Ltd.,* and *Eastern Rotorcraft, supra.* Applying the guidance of those cases, along with that in *Graver, supra,* the range of equivalents of the present claims reaches the S/E spacecraft, wherein sun pulses, though retained on-board, are derived and used in the same way as in Williams to perform the same function, jet firing, which, though "indirect", is synchronized with ISA position precisely as taught by Williams.

The S/E spacecraft and the Williams claimed satellite each have on-board means for transmitting to ground the sun angle

and spin rate. In each, the ground crew determines: (1) present orientation; (2) desired orientation; and (3) where in the spin cycle and how many times the jet must be pulsed to change (1) to (2). Each system, furthermore, provides for receipt of command signals to cause firing of the precession jet. The S/E spacecraft uses sun pulses retained on-board as reference points to fire the jet. Williams uses sun pulses sent to ground as reference points to fire the jet. The difference between operation by retention and operation by sending is achieved by relocating the function, making no change in the function performed, or in the basic manner of operation, or in the result obtained.

### Conclusion on Equivalents

The S/E spacecraft and the claimed Williams satellite reflect the precise circumstance envisaged in *Graver, supra,* for they perform the same function (receipt of and response to command signals from an external location to accomplish precession), in substantially the same way (jet firings synchronized, albeit later and internally, with ISA position) to obtain substantially the same result (controlled precession of spin axis in a predetermined direction to orient a hovering satellite). At the same time, neither resembles as closely the self-guiding space vehicle of McLean or its purely automatic operation.

Accordingly, we hold that Hughes has proven that the government's S/E spacecraft infringe Williams' claims 1, 2, and 3 under the doctrine of equivalents.

### DECISION

The holding that the Williams patent is valid is affirmed. The finding that the claims are not infringed by certain of the accused S/E spacecraft is reversed. The case is remanded for determination of the quantum of recovery due Hughes for infringement by the accused SKYNET II, NATO II, DSCS II, IMP (H and J), SOL-

RAD (9 and 10), and PIONEER (10 and 11) spacecraft.

AFFIRMED–IN–PART, REVERSED–IN–PART, AND REMANDED.

DAVIS, Circuit Judge, concurring in part and dissenting in part.

I join the court's opinion except for the discussion of, and decision on, infringement by the S/E spacecraft through the doctrine of equivalents. On the latter issue, on which I dissent, I agree with Judge Colaianni that the S/E satellites do not infringe the Williams patent. I would therefore affirm all of his decision.

My difference with the majority is that I would hold the doctrine of equivalents inapplicable to the S/E spacecraft involved here because, to find equivalence as the majority does, that doctrine has to be stretched far too broadly for the Williams patent.

1. The status and history of the patent is very important. I agree with the majority that Williams is not a pioneer patent; accordingly, it is not entitled to the broad range of equivalents allowable for pioneer inventions. In addition, the prosecution history shows that, after the citation of McLean, the Williams inventors cancelled several of their original, broad claims and substituted new claims (now claims 1–3) containing new limiting elements directly relevant to the charge of infringement by the S/E satellites: (1) means for providing an indication of ISA to an external location; and (2) means for applying fluid to fluid expulsion means within a fixed time period after the receipt of a control signal from the external location. The accused S/E spacecraft do not contain those elements which were expressly included to overcome prior art.[1] As the majority says, these new claims show that Williams did not submit claims broadly covering all ground controllable spacecraft. An infringing article must embody the two elements I have mentioned, either literally or through an appropriate equivalent. Those elements show the invention which was patented in this Williams patent.

---

1. SKYNET II, NATO II and DSCS II do not have either means; none of the accused S/E

spacecraft (including the three just mentioned plus IMP (H and J)) has the second means.

2. In the light of Williams' non-pioneer status and of this prosecution history I cannot accede to the majority's entire dispensation (with respect to three of the S/E spacecraft) of the specific element of "means * * providing an indication" to a specific external location of the ISA. As the trial judge put it, this part of the claims (and the relevant claims as a whole) expressly call for a structure on the spinning body which is limited "to an altitude control system wherein a ground controller is needed to determine the ISA * * * *."

It is clear, however, that these three accused satellites—SKYNET II, NATO II and DSCS II—do not provide any indication whatever of ISA to the earth (or any other external source). Moreover, the ground personnel have absolutely no need to know the ISA position, do not know it, and cannot determine it. The calculations involving ISA are wholly done by an on-board computer and are available only there. To find, as the majority does, in this self-contained on-board computer an equivalent of the specific requirement for providing an indication of ISA to the ground (so that the ground can take account of ISA) is simply to obliterate and disregard this element of the claims. These accused structures may possibly obtain "the same result" as Williams but they do not perform "the same function" in "the same way" either literally or substantially. Whether or not this on-board device for calculation would be unobvious—and there is no finding and (to my mind) no showing that it would have been obvious—its substitution was not a proper equivalent for infringement of this non-pioneer patent because the wholly on-board computer device operated in a different

way to perform the different function of a significant calculation unrelated to ground personnel.[2] Unlike the Court of Claims decisions cited in the court's opinion this is not the case of a "sophisticated" technique of performing the same function in the same way. It is a "sophisticated" method of performing a different function in a different way. Even if the standard of "obvious and exact equivalents" (*Eastern Rotorcraft Corp. v. United States,* 397 F.2d 978, 982, 154 USPQ 43, 46, 158 USPQ 294 (Ct.Cl. 1968)) is considered as too narrow, the accused devices here are definitely outside the equivalence principle of *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950).

3. The same is true of the elements specifying the method for controlling the precession jet. In this regard, Williams, again as Judge Colaianni points out, limits its claims so as to require a ground controller, not only to determine the ISA, but also to use the ISA to pulse the precession jet during the desired portion of the spin cycle. As to the latter, the claims in suit also require means for pulsing the precession jet within a fixed time period after the receipt of the control signal. This does not occur in any of the accused structures, nor does the ground location use ISA to determine the execute command.[3]

As with the other Williams element ("providing an indication" of ISA) discussed *supra,* the elements pertaining to "firing" or "execution" cannot properly be deemed equivalents of the pertinent Williams elements. The gist of Williams was that this function was to be performed primarily by the ground location acting externally to the

---

**2.** The majority quotes Hughes' expert as testifying that it would have been obvious to place the *calculating device on the spacecraft but the* Government's witnesses testified that this device was not an equivalent.

**3.** The trial judge put it: "[Hughes] admits that in Williams the jet is activated directly upon receipt of the control signal while in the store and execute systems the command signal is first stored and verified. The later execute signal in the store and execute systems sets the original command into action but there is no fixed time interval between the receipt of the

execute signal and the firing of the precession jet. No command signal is synchronized with the ISA. *There is no structure on the store and execute spacecraft which acts to pulse the precession jet within a fixed time period after the receipt of a control signal."* In Williams, on the other hand, "[in] order to permit the ground control to pulse the precession jet during the proper portion of the open cycle, there must be a known fixed time period between the receipt of a control signal and the activation of the precession jet."

spacecraft on the basis of an indication of ISA transmitted to that location.[4] The S/E spacecraft, on the contrary, utilizes an on-board computer and command storage means for receiving and storing a different type of control signal (as well as also using on-board ISA data); ground personnel have only a limited, secondary role and do not take account of ISA. Moreover, in Williams there must be a fixed time period between the receipt by the spacecraft of a control signal and the activation of the precession jet. In the S/E satellites, in contrast, neither the ground nor the execute signal operates to activate the precession jet within a fixed time period (instead, that period varies). The sum of it is that the S/E structures perform a "different function" in a "different way" from those claimed by Williams—and are therefore not within the *Graver* principle.

4. The result, as I see it, is that the doctrine of equivalents cannot be employed in this case without taking an impermissible quantum leap outside the perimeters of that principle as it should be applied to the Williams patent.

---

4. I have already indicated, *supra,* that in my view the prosecution history reflects strong emphasis by the applicants on control through an external location. The trial judge has also taken that position.