**INTERNATIONAL VISUAL CORPORATION, Plaintiff–Appellant,**

v.

**CROWN METAL MANUFACTURING CO., INC., Defendant–Appellee.**

No. 92–1262.

United States Court of Appeals, Federal Circuit.

April 15, 1993.

William F. Dudine, Jr., Darby & Darby, New York City, argued, for plaintiff-appellant. With him on the brief was Robert C. Sullivan, Jr.

Myron C. Cass, Silverman, Cass & Singer, Ltd., Chicago, IL, argued, for defendant-appellee. With him on the brief were Herbert J. Singer and Albert J. Brunett.

Before NIES, Chief Judge, LOURIE, and CLEVENGER, Circuit Judges.

PER CURIAM.

International Visual Corporation (IVC) appeals from the March 9, 1992 judgment of the United States District Court for the Northern District of Illinois granting summary judgment of noninfringement in favor of Crown Metal Manufacturing. *International Visual Corp. v. Crown Metal Mfg. Co.*, 22 USPQ2d 1778, 1992 WL 38376 (N.D.Ill.1992). Because we determine that the district court incorrectly interpreted the claims of IVC's U.S. Patent 4,677,780, we reverse and remand.

## BACKGROUND

The '780 patent is entitled "Magnetically Secured Display Apparatus." On August 10, 1989, IVC filed a complaint alleging that Crown's GRIPPER device infringed claims 1–3 and 6–10 of the patent. Crown counterclaimed for a declaratory judgment of noninfringement, invalidity, and unenforceability. IVC then moved for summary judgment on the issues of infringement, willful infringement, and Crown's invalidity defense, and Crown moved for summary judgment of invalidity and unenforceability, but did not move for summary judgment of noninfringement. The district court denied IVC's motion, granted Crown's motion on the ground of noninfringement, and dismissed the case in its entirety.

## DISCUSSION

The issue before us is whether the district court properly granted summary judgment of noninfringement. We review the district court's grant of summary judgment *de novo, see National Cable Television Ass'n v. American Cinema Editors, Inc.*, 937 F.2d 1572, 1576, 19 USPQ2d 1424, 1427 (Fed.Cir.1991), and specifically determine whether the court's claim interpretation was legally correct. *Palumbo v. Don–Joy Co.*, 762 F.2d 969, 974, 226 USPQ 5, 8 (Fed.Cir.1985).

At the outset, we reject IVC's argument that the district court was precluded from granting summary judgment of noninfringement on the ground that Crown did not specifically move for summary judgment on that issue. "[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence." *Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). In the instant case, the record clearly shows that IVC had notice that the issue of noninfringement was before the court on the parties' cross-motions for summary judgment. IVC in fact stated that "the infringement issue is now ripe for summary adjudication," and argued the issue of infringement, both literal and under the doctrine of equivalents, on several occasions. Thus, summary judgment of noninfringement for Crown was not precluded merely because Crown did not move for summary judgment on that ground.

### *Literal Infringement*

■ The court held that the GRIPPER did not infringe independent claims 1 and 10,[1] either literally or under the doctrine of

---

1. Claims 1 and 10 read as follows:

   1. A sign holder for securing a vertical planar sign on a magnetically attractable support rod of a clothing rack, or the like, comprising: a frame member for holding the sign; and clamp means for connecting said frame member to said rod, said clamp means including, (i) an *L-shaped tubular housing having a first leg portion and a transverse second leg portion extending from one end of said first leg portion,* (ii) *permanent magnet means integrally connected to said first leg portion for detachably magnetically clamping said first leg portion to a vertical surface of the rod,* with said second leg portion overlying and supported on an upper horizontal surface of the rod, and (iii) connecting means for detachably connecting said frame member to said transverse second leg portion for supporting said frame member and the sign held therein in a substantially vertical plane when said first leg portion is magnetically attached to said vertical surface of said rod, whereby the weight of the frame member and the sign held therein passes through said second leg portion to, and is borne entirely by, the rod, said magnet means serving only to resist displacement of the sign holder [emphasis added].

equivalents.[2] As to literal infringement, the court held that the GRIPPER did not meet the "housing limitation" and "[a]ccordingly, ... [did] not literally infringe independent claims 1 and 10 of the '780 patent as a matter of law." 22 USPQ2d at 1780. Consequently, the court held that there was no literal infringement of dependent claims 2, 3, and 6–9.

The court described the GRIPPER as follows:

> The defendant's GRIPPER clamp consists of a permanent bar magnet secured into a U-shaped ferromagnetic "channel member" which has been bent into an L-shape. There is *no separate housing* since the U-shaped channel functions as a receptacle for the bar magnets and as a pole piece to significantly increase the magnetic strength of the flat bar magnets.

*Id.* at 1779 (emphasis added). The court concluded:

> The GRIPPER undisputedly does not have a *housing separate and apart from the components of the operational magnet* (i.e., the permanent bar magnet and the pole pieces). This housing limitation set forth in the '780 patent is not found exactly in the accused GRIPPER.

*Id.* at 1780 (emphasis added).

IVC argues that the district court's interpretation of the "housing" limitation was erroneous. It asserts that the court erroneously interpreted claim 1 to require that it be "separate and apart" from the permanent magnet means. We agree. Claim 1 requires a clamp means that includes an L-shaped tubular housing and a permanent magnet means *integrally connected* to the first leg portion of the housing. There is no "separate and apart" limitation in the claims; that phrase appears nowhere in the '780 patent. The term "integrally connected" in claim 1 is inconsistent with a requirement that the housing and permanent magnet be "separate and apart." Crown in fact conceded at oral argument that the GRIPPER channel member is a "housing" within the meaning of the claim.

■ The implication of the court's conclusion that there also is no infringement of claim 10 is that the court considered that claim 10 requires a housing. Claim 10, however, unlike claim 1, does not require a "housing," but includes a "clamp portion being generally L-shaped and having a tubular horizontal leg ... and a tubular vertical leg." Moreover, the requirement that the magnet means be *in* the tubular vertical leg of the clamp is inconsistent with the court's requirement of separateness between the magnet and a housing.

■ We also agree with IVC that the court incorrectly construed the claims to require a plastic housing. The specification of the '780 patent describes a plastic housing only as a preferred embodiment of the invention; Crown conceded at oral argument that the claims are not so limited. In concluding that the claims are limited to a plastic housing, the court apparently fo-

10. A display device of the type having a generally planar vertical display portion for displaying information on merchandise racks having structural rod members with vertical and horizontal surfaces of magnetically permeable material and a clamp portion for releasably connecting said display portion to such structural rod member, characterized by,

(a) said *clamp portion being generally L-shaped and having a tubular horizontal leg adapted to overlie and be supported on the horizontal surface of the rod member and a tubular vertical leg adapted to overlie and contact the vertical surface of the rod member,* and

(b) *permanent magnet means in said vertical leg of said clamp portion for magnetically attracting the vertical surface of the rod member for adhering said clamp portion thereto,*

(c) said display portion including a connecting portion and said horizontal leg of said clamp portion comprising connecting means adapted to releasably receive said connecting portion of said display portion whereby the entire weight of said display portion is supported solely by the rod member and said magnet means need have sufficient magnetic strength to only minimize the risk of inadvertent displacement of said display portion, without having to support the weight thereof [emphasis added].

2. Drawings of IVC's commercial embodiment of the '780 invention, the HUGGER; Crown's GRIPPER; and the prior art Delenne holder (*see infra* p. 772), as shown in the district court's opinion, appear at the conclusion of this opinion.

cused on the HUGGER, IVC's commercial embodiment of the '780 patent, which has a plastic housing. This was erroneous since "[i]nfringement is determined on the basis of the claims, not on the basis of a comparison with the patentee's commercial embodiment of the claimed invention." *ACS Hosp. Sys., Inc. v. Montefiore Hosp.*, 732 F.2d 1572, 1578, 221 USPQ 929, 933 (Fed. Cir.1984). Thus, because of erroneous claim construction, the court's conclusions on literal infringement must be reconsidered.

## Doctrine of Equivalents

■ The court also examined the question of infringement under the doctrine of equivalents and concluded that the GRIPPER performed substantially the same function in substantially the same way to obtain substantially the same result as the '780 invention. 22 USPQ2d at 1781. It nevertheless held that there was no infringement under the doctrine of equivalents because the range of equivalents sought by IVC "would have been obvious" in view of a French patent to Delenne. *Id.* at 1782. In so holding, the court employed the "hypothetical claim" approach of *Wilson Sporting Goods Co. v. David Geoffrey & Assoc.*, 904 F.2d 677, 14 USPQ2d 1942 (Fed.Cir.), *cert. denied*, 498 U.S. 992, 111 S.Ct. 537, 112 L.Ed.2d 547 (1990).

■ Hypothetical claim analysis is an optional way of evaluating whether prior art limits the application of the doctrine of equivalents. It is simply a way of expressing the well-established principle "that a patentee should not be able to obtain, under the doctrine of equivalents, coverage which he could not lawfully have obtained from the PTO by literal claims." *Id.* at 684, 14 USPQ2d at 1948. If utilized, this approach requires a court to visualize a hypothetical claim that enlarges the scope of an issued claim so that it literally covers an accused device and to determine whether that hypothetical claim would have been patentable over the prior art. *Id.* at 684–85, 14 USPQ2d at 1948–49; *Jurgens v. McKasy*, 927 F.2d 1552, 1561, 18 USPQ2d 1031, 1038 (Fed.Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 281, 116 L.Ed.2d 232 (1991).

The trial court here utilized a hypothetical claim in its analysis, stating:

> The 'angular' clamping mechanism of the Delenne '224 is, *like the hypothetical claim*, a two-legged L-shaped magnetic assembly, *without a separate housing*, which attaches to a 'square section' of a rod.

22 USPQ2d at 1782 (emphasis added). However, because the court based its conclusion that the GRIPPER literally escaped the '780 claims only by lacking a housing "separate and apart" from the permanent magnet means, a distinction that we now hold to be based upon an erroneous claim interpretation, it is not clear that a suitable hypothetical claim that covers the GRIPPER would necessarily have been obvious over Delenne. Thus, remand is appropriate based on our claim interpretation. On the other hand, on remand the court may decide that, in light of its new analysis of literal infringement, if it concludes there is infringement, application of the doctrine of equivalents is not necessary.

## CONCLUSION

We reverse the court's grant of summary judgment of noninfringement, and remand for proceedings consistent with this opinion.

## COSTS

Each party shall bear its own costs.

REVERSED AND REMANDED.

APPENDIX

**Plaintiff's "HUGGER"**

**Defendant's "GRIPPER"**

**Delenne '224 French Patent**

---

LOURIE, Circuit Judge, concurring.

I fully join the panel opinion. However, I would have gone further than the opinion in instructing the district court concerning application of the doctrine of equivalents on remand. I therefore wish to express some separate views concerning the much-troubled doctrine of equivalents.

The Supreme Court in *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950), provided today's framework for evaluating the doctrine in 1950 when it stated that it is designed to avoid "a fraud on a patent" by discouraging "the unscrupulous copyist [from] mak[ing] unimportant and insubstantial changes and substitutions in the patent which, though adding nothing,

would be enough to take the copied matter outside the claim, and hence outside the reach of law." *Id.* at 607–08, 70 S.Ct. at 855–56. The Court noted that the doctrine is necessary to avoid "plac[ing] the inventor at the mercy of verbalism and ... subordinating substance to form." *Id.* at 607, 70 S.Ct. at 855. The Court also focussed on what are often referred to as the "tripartite" tests, stating that an accused device is an equivalent " 'if it performs substantially the same function in substantially the same way to obtain the same result.' " *Id.* at 608, 70 S.Ct. at 856 (quoting *Sanitary Refrigerator Co. v. Winters,* 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147 (1929)).

In recent years, we have emphasized that the doctrine is equitable in nature. *See Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 935, 4 USPQ2d 1737, 1739 (Fed.Cir.1987) (*in banc*); *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 870, 228 USPQ 90, 96 (Fed.Cir.1985); *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1361, 219 USPQ 473, 480 (Fed.Cir. 1983). Unfortunately, however, the tripartite test has become a mechanical formula which can often be applied to accused infringers who are not unscrupulous copyists and who have made more than insubstantial changes, under circumstances in which it may not be equitable to do so.

The doctrine of equivalents is a sound one, important for the proper protection of patentable inventions. However, the doctrine has its limits, and I believe that a court must ensure that it achieves its intended purpose and does not simply become an automatic means for expanding the scope of a claim beyond that granted by examination in the Patent and Trademark Office. We have in fact noted that "the doctrine of equivalents is the exception, ... not the rule, for if the public comes to believe (or fear) that the language of patent claims can never be relied on, and the doctrine of equivalents is simply the second prong of every infringement charge, regularly available to extend protection beyond the scope of the claims, then claims will cease to serve their intended purpose." *London v. Carson Pirie Scott & Co.,* 946 F.2d 1534, 1538, 20 USPQ2d 1456, 1458–59 (Fed.Cir.1991). *See also Charles Greiner & Co. v. Mari–Med Mfg. Inc.,* 962 F.2d 1031, 1036, 22 USPQ2d 1526, 1529 (Fed.Cir.1992).

It is important that the public be able to rely on the claims of a patent, in conjunction with the specification and file history, as indicating "the metes and bounds of the claimed invention." *London,* 946 F.2d at 1538, 20 USPQ2d at 1458. Because the doctrine of equivalents runs counter to the role of claims as the sole measure of the invention, the claims may no longer adequately inform the public of the scope of protection, and uncertainty and unjustified litigation can result. The solution may be to go beyond the tripartite tests.

The Supreme Court did not make clear in *Graver Tank* whether the tripartite tests themselves constitute the application of equity or whether there is an equitable duty upon a court beyond the application of the tripartite tests. This court has not done so either. However, nothing in *Graver Tank* states that mere satisfaction of the tripartite tests itself establishes infringement by equivalence. In fact, the Court stated that "[e]quivalence ... is not the prisoner of a formula and is not an absolute to be considered in a vacuum." 339 U.S. at 609, 70 S.Ct. at 856. The Court specifically distinguished non-infringing parties from infringing copyists by stating that "[w]ithout some explanation or indication that [the accused product] was developed by independent research, the trial court could properly infer that the accused flux is the result of imitation rather than experimentation or invention." *Id.* at 612, 70 S.Ct. at 858. Thus, the Court took account of the fact that there may be instances in which the function-way-result tests may be satisfied, but the facts may not justify the application of the doctrine of equivalents. This might occur if independent research resulted in an invention or product significantly different from what is claimed, albeit one that might perform substantially the same function in the same way to obtain the same result.

The tripartite tests often examine only what a device does, rather than what it is. Claims to machines, articles of manufacture, and compositions of matter generally define inventions by what they are, i.e., structurally. Thus, products may meet the tripartite tests in terms of what they do but be significantly different in terms of what they are. Processes are defined by their steps, so they may also be different in terms of what they are, even if they are the same in what they do.

Thus the Supreme Court may be considered to have articulated requirements beyond the tripartite tests to enable one to determine whether an accused device which does not literally infringe the claims of a patent infringes under the doctrine of equivalents. Prosecution history estoppel and avoidance of the prior art are of course well-established aspects of the factual evaluation of infringement under the doctrine, but the placing of an accused device on the copying-independent development spectrum should also be a critical inquiry in evaluating doctrine of equivalents questions. So should the degree of similarity of an accused invention to what is literally claimed; the closer the similarity, or the more "insubstantial" the change from what is literally claimed, the greater the argument for equivalence, independent of the tripartite tests.

Moreover, recognizing the equitable basis for the doctrine, there may be other factors that a court should consider beyond the tripartite function-way-result tests. Whether a patent claims a pioneering invention may be a factor favoring the application of the doctrine. On the other hand, an attempt at extension of coverage by means of the doctrine of equivalents to include disclosed, but unclaimed, subject matter may not be deserving of equitable consideration because it essentially permits a patentee to avoid examination by the Patent and Trademark Office. A patent applicant should not be able to present a broad disclosure in the specification of his or her patent, file narrow claims, and after allowance and grant of those narrow claims, seek to extend protection by the doctrine of equivalents to the disclosed, but unexamined, subject matter.* The district court is in the best position to determine whether there are any equities that argue for or against its application.

If there is no prosecution history estoppel, if application of the doctrine would not encompass the prior art, and if the tripartite tests are met, I believe that a court should make a separate equitable determination, specifically including the above-noted "spectrum" and "similarity" evaluations in order to find infringement under the doctrine of equivalents. Ultimately, a court needs to balance the public's need for certainty with the need for fairness to the patentee. The above-outlined criteria ought to enhance the accuracy of this judgment.

---

* Patentees do have a limited two-year reissue right to enlarge the scope of granted claims. 35 U.S.C. § 251 (1988).